IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DEBRA MOODY, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | |
| v. | Civil Action No. 15-8319 (JBS) |
| COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **OPINION** |
| Defendant. | |

APPEARANCES:

Alan H. Polonsky, Esq.
POLONSKY & POLONSKY
512 S. White Horse Pike
Audubon, NJ 01806
        Attorney for Plaintiff

Andrew Charles Lynch, Esq.
Social Security Administration
Office of the General Counsel
300 Spring Garden Street, 6th Floor
Philadelphia, PA 19123
        Attorney for Defendant

**SIMANDLE, Chief Judge:**

**I. INTRODUCTION**

In this action, Plaintiff Debra Moody (hereinafter, "Plaintiff" or "Ms. Moody") seeks review of the Commissioner of the Social Security Administration's (hereinafter, "Defendant" or "the Commissioner") denial of her application for Supplemental Security Benefits under Title XVI of the Social Security Act ("SSA"), pursuant to 42 U.S.C. § 405(g).

Plaintiff claims she is disabled due to several ailments, including fibromyalgia, rheumatoid arthritis, degenerative disc disease of the cervical and lumbar spine, carpal tunnel syndrome, osteoarthritis, internal derangement of the left knee, osteoarthrosis localized to the pelvis, urinary retention, and obesity.  On May 1, 2015, Administrative Law Judge ("ALJ") Michael J. Stacchini, issued a 10-page opinion finding that Plaintiff was not entitled to Social Security benefits.  The ALJ arrived at this decision after taking testimony from a vocational expert who noted that an individual with Plaintiff's education, residual functional capacity, and vocational profile could still perform at least three types of unskilled jobs in the light exertional category.

In the pending appeal, Plaintiff argues that the ALJ's decision must be reversed and remanded on two grounds.  First, she argues that ALJ Stacchini's finding as to her residual functional capacity was not supported by substantial evidence because the ALJ did not give appropriate weight to Plaintiff's treating physician's opinion.  Second, she argues that ALJ Stacchini's decision that the Commissioner had met his burden of proof at Step Five of the Sequential Evaluation Process in demonstrating that there were a significant number of alternate jobs that Plaintiff was able to perform was not supported by substantial evidence.

2

For the reasons that follow, and after careful review of
the entire record, the parties' submissions, and the applicable
law, the Court will remand the case for further adjudication
regarding the classification of Plaintiff's past relevant work.

## II.  BACKGROUND

### A. Procedural Background

Plaintiff Debra Annece Moody filed an application for
social security disability benefits on May 14, 2013, alleging an
onset of disability date of October 15, 2012, at the age of 54.
(R. at 21.)  Her claim was denied by the Social Security
Administration on August 9, 2013. (Id.)  After her claim was
also denied upon reconsideration on September 25, 2013,
Plaintiff appeared before ALJ Stacchini on March 4, 2015, during
which the ALJ received testimony from Vocational Expert ("VE")
Linda A. Stein and from Plaintiff, via telephone. (Id.)  The ALJ
denied benefits in a May 1, 2015 Opinion. (Id.)  On November 4,
2015, the Appeals Council denied Plaintiff's request for review.
(Id. at 1-4.)  This appeal followed.

### B. Factual Background

Plaintiff was born on January 4, 1958 and is currently 58
years old. (R. at 287.)  From July 1990 to June 2012, she worked
at the Black People's Unity Movement (BPUM) Child Development
Center in Camden, New Jersey. (Id. at 171, 250, 270).  She
alleges that she is disabled and unable to work since October

3

2012 due to generalized pain, swelling of the joints, and left knee pain due to fibromyalgia and rheumatoid arthritis. (Id. at 25.)

### 1. Initial pain

Plaintiff has experienced a serious of ailments beginning in 2002. (Id. at 304, 409.)  The record indicates that Ms. Moody has a history of rheumatoid arthritis/fibromyalgia, causing generalized joint pain in the ankles, wrist, back, shoulders, both hands, left palm, and wrists with swelling in the left ankle, wrists and hands, dry eyes/mouth (sicca) and morning stiffness lasting one hour. (Id. at 25.)  Specifically regarding the present matter, in February 2012, Ms. Moody tested positive for rheumatoid factor and ANA, and was given Naproxen on an "as per needed basis." (Id.)  She was also diagnosed with fibromyalgia, based on 18/18 tender points on examination, together with paresthesias and numbness in the leg. (Id.)

### 2. October 2012 Emergency Room Visit

In October 2012, Ms. Moody sought emergency room treatment for left leg and hip pain with ambulation. (Id. at 292-303.) Physical examination showed that the claimant had a normal gait, with no evidence of joint swelling, joint stiffness, or redness. A follow—up visit with her primary care physician, Dr. Susan Laws-Mobilio, yielded a diagnosis of osteoarthritis localized to

the pelvis, a hip strain, and urinary retention. (Id. at 362-63.)

### 3. Treatment with Dr. Mishra (December 2012)

In December 2012, treating rheumatologist Richa Mishra noted just 5/18 fibromyalgia tender points, in contrast to Ms. Moody's February 2012 diagnosis of 18/18 tender points. (Id. at 26, 368.)  X-rays of the bilateral wrists and the bilateral knees showed arthopathy at the right first carpometacarpal joint, and, to a lesser degree, on the left at the same level; mild medial compartment joint space narrowing at the right knee and medial femoral tibial compartment joint space narrowing at the left knee, with no evidence of acute osseous abnormality at either knee. (Id. at 25, 388-390.)  Dr. Mishra diagnosed Plaintiff with fibromyalgia, chronic polyarthritis, osteoarthritis, anserine bursitis, sicca, and carpal tunnel syndrome. (R. at 370.)

### 4. Treatment with Dr. Montemayor (July 2013)

In July 2013, consulting orthopedist Mary Montemayor, M.D. noted no evidence of muscular tender points or trigger points on physical exam with full range of motion of the joints. (Id. at 27, 409.)  She opined that Ms. Moody would be able to sit, stand, and walk "normally" in an 8-hour workday, and that she would be able to finger and grasp, and to reach with the right and left upper extremity. (R. at 28.)

5

### 5. State Agency Opinions (August and September 2013)

In August 2013, State Agency medical consultant Arvind Chopra, M.D. reviewed all of Plaintiff's medical records up to that point, and opined that Ms. Moody had the residual functional capacity for a full range of light exertion work. (Id. at 77-79.) In September 2013, upon reconsideration, State Agency medical consultant Mary McLarnon, M.D. affirmed the findings of Dr. Chopra. (Id. at 85-90.) Both doctors characterized Plaintiff's past relevant work as an Administrative Supervisor, SVP 4, DOT 219.362-010. (Id. at 79, 88-89.)

### 6. Treatment with Dr. Traisak (July 2014)

Plaintiff further sought treatment with rheumatologist Pamela Traisak in July 2014. Dr. Traisak found that Ms. Moody still had active rheumatoid arthritis and fibromyalgia with evidence of synovitis in her ankles, as well as in the hands and wrists and mild myofascial tenderness at 11 of 18 tender points. (Id. at 26-27, 492.) Dr. Traisak further noted that Ms. Moody had full strength (5/5) for the bilateral upper and lower extremities; full range of motion of the major joints, no knee effusions, and a nonfocal neurological exam. (Id. at 27, 494.) She further advised Ms. Moody to "exercise regularly to help with Fibromyalgia." (Id. at 495.)

### 7. Other Pain

Plaintiff has experienced further health problems, specifically back pain and longstanding radiculopathy, and an MRI of her lumbar spine in November 2014 showed degenerative changes with moderate central canal stenosis and mild foraminal stenosis, but no disc herniation. (Id. at 27, 500.)  She had one session of physical therapy in January 2015, but it did not help. (Id. at 527-28).

Regarding Plaintiff's left knee, x-rays done in August 2014 showed mild tricompartmental degenerative changes/osteoarthritis and no joint effusion (Id. at 27.)  A follow-up MRI in October 2014 revealed minimal joint effusion; medial and lateral compartment chondrosis; high-grade patellofemoral chondrosis; questionable post-operative meniscus repair vs. meniscal retear; and moderate insertional quadriceps tendinosis. (Id. at 512.)

Ms. Moody uses nighttime braces for her carpal tunnel syndrome, but she has received no surgical intervention or additional therapy. (Id. at 27, 75.)

### 8. Treatment with Dr. Laws-Mobilio (February 2015)

Finally, in February 2015, Plaintiff's primary care physician, Dr. Susan Laws-Mobilio opined that Plaintiff can lift 10 pounds occasionally, as well as sit/stand/walk a total of 4 hours in an 8-hour workday, and only occasionally engage in activities using her hands and feet, while never engaging in

7

postural activity such as climbing, stooping, kneeling, crouching, or crawling. (<u>Id.</u> at 28, 590-598.)

**C. Plaintiff's Testimony Before the ALJ**

Plaintiff testified before ALJ Michael J. Stacchini on March 4, 2015. (<u>Id</u>. at 38.) She was represented by Leo Hamilton, a non-attorney representative. (<u>Id.</u> at 41.) Plaintiff testified that she lives in a house with her husband, daughter, and two granddaughters, ages 6 and 4. (R. at 46.) She further testified that "when [she is] able," she helps her granddaughters get ready for daycare, prepares meals, and changes them. (<u>Id.</u> at 48.) She "sometimes" drives her husband and daughter to work, as well as drops her grandchildren off at school and daycare. (<u>Id.</u>) During the days, she "make[s] [her]self breakfast" and does "housework or laundry." (<u>Id.</u> at 49.) Finally, she testified that since October 2012, she has been applying for "clerical or bookkeeping" types of jobs, and her last job ended because she "was laid off due to lack of funds." (<u>Id.</u> at 50.)

Ms. Moody then articulated her various medical ailments to the ALJ – the fact that she gets "numbness and tingling in [her] hands and [her] feet and arms" almost every day from her fibromyalgia, her "swelling and pain" that occurs "all the time" from her RA, as well as pain in her neck and upper back. (<u>Id.</u> at 51-52.) She also described pain in her hip and lower back, as

8

well as her wrist braces for carpal tunnel syndrome. (Id. at 53.)  Ms. Moody explained that her urinary retention problems force her to go to the bathroom "every two hours." (Id. at 54.) Finally, she further testified that she uses a cane "around the house" and primarily for "support." (Id. at 56.)

### D. VE Testimony Before the ALJ

Vocational Expert Linda Stein also testified at the March 4, 2015 hearing.  First, during a discussion about classifying Plaintiff's past work, after Ms. Moody confirmed that she dealt with children and was a substitute teacher, the ALJ asked if she prepared curriculums. (Id. at 44-45.) The following colloquy took place:

> ALJ: You were teaching classes? Were you preparing curriculum at all?
> CLMT: Yes, mm-hmm.
> ALJ: What were you preparing curriculums for?
> CLMT: Oh, curriculum, I'm sorry, no, I didn't prepare curriculum. That's usually done in advance.
> ALJ: Oh. So at times you were teaching the classroom, in the classroom. What other responsibilities did you have?
> CLMT: Well, there was changing children, the infants, playing with them or doing, helping them do circle time.
> ALJ: All right. So sometimes you were actually in the classroom. That you described. What were your other duties and responsibilities as the supervisor?
> CLMT: As the supervisor, I was the director's right hand, so I did anything that needed to be done.
> ALJ: And what was that? You were preparing reports? What else were you doing?
> CLMT: Preparing reports, payroll, setting up for meetings, sometimes conducting meetings, and then the usual additional stuff, typing, filing, answering the phones.
> ALJ: Okay, Is that enough information, Ms. Stein?
> VE: I'm going to describe that as a school administrator, and it's also known as a supervisor, education.

ALJ: Okay.
VE: The DOT for that is 099.117.026. It has an SVP of 8 and
an exertional level of light.
ALJ: Are there any transferable skills in that job or not
that's sedentary?
VE: Well, there are the clerical skills that were described
are universally generalizable and it's described using
computers, keeping records.

(R. 44-46.)  Then, later in the examination, the VE explained

that "the [school administrator classification] is closest to

what I believe the position was. There's not an exact fit in the

DOT." (Id. at 60.) The ALJ responded: "All right, But based on

your expertise, based on your training, this is how you would

classify it, correct?  The VE responded: "Yes." (Id.)

**E. The ALJ Decision**

ALJ Stacchini issued a 10-page written decision on May 1,

2015, ultimately finding that Plaintiff was not disabled within

the meaning of the Social Security Act, as he made the following

findings:

1. Ms. Moody meets the insured status requirements of the

   Social Security Act through December 31, 2016.

2. Ms. Moody has not engaged in substantial gainful activity

   since October 15, 2012, the alleged onset date (20 CFR

   404.1571 et seq.)

3. Ms. Moody has the following severe impairments:

   fibromyalgia, rheumatoid arthritis (RA)/polyarthritis;

   degenerative disc disease (DDD) of the cervical and

lumbar spine; carpal tunnel syndrome (CTS), osteoarthritis; internal derangement of the left knee, osteoarthrosis localized to the pelvis; urinary retention, and obesity (20 CFR 404.1520(c)).

4. Ms. Moody does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. Ms. Moody has the residual functional capacity to perform sedentary work, as defined in 20 CFR 404.1567(a), with the following additional limitations: Ms. Moody can balance, stoop, kneel, crouch, crawl, and climb ramps and stairs occasionally, but she cannot climb ladders, ropes or scaffolds. She can frequently use her hands for handling and fingering, and she is allowed to use a cane for ambulation and use the contralateral upper extremity to lift/carry up to 10 pounds. She is allowed regularly scheduled breaks of 15 minutes each in the mornings and afternoons, and a 1/2 hour to 1-hour midday break.

6. Ms. Moody is unable to perform any past relevant work (20 CFR 404.1565).

7. Ms. Moody was born on January 4, 1958 and was 54 years old, which is defined as "an individual closely

11

> approaching advanced age," on the alleged disability
> onset date. The claimant subsequently changed age
> category to "advanced age" (20 CFR 404.1563).

8. Ms. Moody has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Ms. Moody has acquired work skills from past relevant work (20 CFR 404.1568).

10. Considering Ms. Moody's age, education, work experience, and residual functional capacity, Ms. Moody has acquired work skills relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy (20 CFR 404.1569, 404.1569(a) and 404.1568(d)).

11. Ms. Moody has not been under a disability, as defined in the Social Security Act, from October 15, 2012, through the date of the ALJ decision (20 CFR 404.1520(g)).

(R. 23-30.) Specifically regarding residual functional capacity (Finding 5), the ALJ gave "some weight" to Dr. Montemayor's July 2013 opinion, "as it is consistent with normal findings on examination, including a steady gait, full range of motion in the upper and lower extremities, and no tender or trigger points." (R. at 28.) The ALJ gave "significant weight" to Dr. McLarnon's September 2013 opinion, "as it was based on a review

12

of the available medical records and objective clinical and diagnostic findings." (Id.) The ALJ gave "some weight" to Dr. Mobilio's February 2015 opinion that Ms. Moody can lift 10 pounds occasionally, but gave "little weight" to the portion of her opinion regarding Ms. Moody's only being able to sit/stand/walk a total of 4 hours in an 8 hour workday, and only occasionally engaging in activities using her hands and feet. (Id.) He reasoned that this was "inconsistent with the medical evidence including the claimants (sic) conservative course of treatment and physical examinations described in detail above and with the claimant's testimony regarding her ADLs." (Id.)

Regarding Plaintiff's past relevant work (Findings 6 and 9), the ALJ adopted the VE's testimony that her past relevant work was classified as a School Administrator (DOT 099.117-026), light, skilled SVP 8. (Id. at 29.)  The ALJ also adopted the VE's testimony regarding the School Administrator position requiring the following skills: clerical skills including preparing payroll, report-writing, typing, greeting customers and telephone skills. (Id.)  Finally, the ALJ adopted the VE's testimony that Plaintiff's skills to transfer to occupations such as Administrative Assistant (DOT 169.167-010), Sedentary, SVP 7; Information Clerk, (DOT 237.367-022), Sedentary, SVP 4; and Receptionist (237.367-038), Sedentary, SVP 4. (R. at 30.) The ALJ concluded that these jobs were so similar to Plaintiff's

13

past work that she would need very little, if any, vocational adjustment in terms of tools, work processes, work setting or industry (Id.)  The ALJ thus determined that Plaintiff was not disabled within the meaning of the Act.

## III. STANDARD OF REVIEW

The Court has jurisdiction to review the final decision pursuant to 42 U.S.C. § 405(g).  When reviewing the denial of disability benefits, the Court must determine whether substantial evidence supports the denial. See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008).  The requirement of substantial evidence, however, constitutes a deferential standard of review, see Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004), and does not require "a large or [even] considerable amount of evidence." Pierce v. Underwood, 487 U.S. 552, 564 (1988).  Rather, substantial evidence requires "more than a mere scintilla[,]" Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999), but generally less than a preponderance. See Jones, 364 F.3d at 503.  Consequently, substantial evidence supports the Commissioner's determination where a "reasonable mind might accept the relevant evidence as adequate" to support the conclusion reached by the Commissioner. Monsour Med. Ctr. v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).

14

In order to facilitate this Court's review, the ALJ must set out a specific factual basis for each finding. See Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1974), cert. denied, 420 U.S. 931 (1975).  Additionally, the ALJ "must adequately explain in the record [the] reasons for rejecting or discrediting competent evidence," Ogden v. Bowen, 677 F. Supp. 273, 278 (M.D. Pa. 1987) (citing Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)), and must review all pertinent medical and nonmedical evidence "and explain his conciliations and rejections." Burnett v. Comm'r of Soc. Sec. Admin., 220 F.3d 112, 122 (3d Cir. 2000).  However, the ALJ need not discuss "every tidbit of evidence included in the record." Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004).  Rather, the ALJ must set forth sufficient findings to satisfy the reviewing court that the ALJ arrived at a decision through application of the proper legal standards, and upon a complete review of the relevant factual record. See Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983).

## IV.  DISCUSSION

### A. LEGAL STANDARD FOR DETERMINING DISABILITY

To be eligible for social security disability insurance benefits, a claimant must have a "medically determinable physical or mental impairment" that prevents her from engaging in any "substantial gainful activity" for a continuous twelve-month period. 42 U.S.C. § 1382c(a)(3)(A); Plummer v. Apfel, 186

F.3d 422, 427 (3d Cir. 1999).  A claimant lacks the ability to engage in any substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B); Plummer, 186 F.3d at 427-28.

The Commissioner reviews disability claims in accordance with a five-step process set forth in 20 C.F.R. § 404.1520. In step one, the Commissioner must determine whether the claimant is currently engaged in "substantial gainful activity." 20 C.F.R. § 1520(b).  If the answer is yes, the disability claim will be denied. See Bowen v. Yuckert, 482 U.S. 137, 140 (1987). In step two, the Commissioner must determine whether the claimant is suffering from a "severe impairment," defined as an impairment "which significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 1520(c).  A claimant who cannot claim a "severe" impairment is ineligible for benefits. Plummer, 186 F.3d at 428.

Step three requires the Commissioner to compare the medical evidence of the claimant's impairment to a list of impairments presumed severe enough to preclude any gainful activity. 20 C.F.R. § 1520(d).  If a claimant suffers from a listed

16

impairment or its equivalent, she is approved for disability benefits and the analysis stops.  If she does not suffer from a listed impairment or its equivalent, the analysis proceeds to steps four and five to determine whether the she retains the ability to engage in substantial gainful activity. Plummer, 186 F.3d at 428.

The Commissioner conducts a residual functional capacity ("RFC") assessment at steps four and five.  The RFC assessment considers all of the claimant's medically determinable impairments and determines the most the claimant can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1)-(2).  The RFC is expressed in terms of physical exertional levels of sedentary, light, medium, heavy, or very heavy work. 20 C.F.R. § 416.967 (2002).  Based on the claimant's RFC, the Commissioner determines, at step four, whether the claimant can perform the physical exertion requirements of his past relevant work. 20 C.F.R. § 404.1520(f).  If she is unable to resume her former occupation, the Commissioner will then proceed to the final step and decide whether the claimant is capable of performing other work existing in significant numbers in the national economy, taking into account her RFC and vocational factors such as age, education, and work experience. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

17

In the final step, Step Five, the ALJ relies on the Medical-Vocational Guidelines ("Guidelines" or "Grids") set forth in 20 C.F.R. Part 404, Subpart P, Appendix 2, which establish the types and number of jobs that exist in the national economy for claimants with certain exertional impairments.  The Guidelines "consist of a matrix of four factors – physical ability, age, education, and work experience – and set forth rules that identify whether jobs requiring specific combinations of these factors exist in significant numbers in the national economy." Sykes v. Apfel, 228 F.3d 259, 273 (3d Cir. 2000).

When a claimant's combination of factors correspond with the same combination of factors in the Grid, the Grid will direct a conclusion as to disability, which the ALJ must follow. Id.; see also Hall v. Comm'r of Soc. Sec., 218 F. App'x 212, 216 (3d Cir. 2007) ("When the four factors in a claimant's case correspond exactly with the four factors set forth in the grids, the ALJ must reach the result the grids reach.") (emphasis in original). However, where a claimant's specific profile is not listed in the Grid, such as when the claimant has certain limitations to their exertional capacity and can perform something in between two exertional ranges of work, the Grid does not mandate a specific finding, and may only be used as a framework to guide the disability decision. See 20 C.F.R. Pt.

404, Subpt. P, App. 2, § 200.00(d).  In such cases, the ALJ must support his determination by relying on vocational testimony or similar evidence to decide whether a significant number of jobs exist for a particular claimant given his specific background and exertional limitations. See Sykes, 228 F.3d at 264; Hall, 218 F. App'x at 217. If, after considering all the evidence, the answer is no, a finding of "disabled" is required. However, if the Commissioner determines that jobs exist in significant numbers in the national economy for a particular claimant, the Commissioner will find the claimant "not disabled." See Sykes, 228 F.3d at 273.

### B. THE ALJ DID NOT ERR IN ITS WEIGHING OF PLAINTIFF'S TREATING AND NON-TREATING PHYSICIANS' OPINIONS

Plaintiff first contests the ALJ's RFC determination, arguing that the ALJ did not properly weigh her treating physician's opinion.  She makes three arguments: (1) the ALJ improperly relied on non-examining and non-treating physicians, (2) Plaintiff's treating physician was improperly discounted, and (3) the ALJ's decision lacked an adequate discussion of activities of daily living and credibility.

SSR 96-8p dictates that the RFC assessment is a "function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." SSR 96-8p.  In order to meet the requirements of SSR 96-8p, the ALJ

19

"must specify the evidence that he relied upon to support his conclusion." Sullivan v. Comm'r of Soc. Sec., No. 12-7668, 2013 WL 5973799, at *8 (D.N.J. Nov. 8, 2013). "Moreover, the ALJ's finding of residual functional capacity must be "accompanied by a clear and satisfactory explanation of the basis on which it rests." Fargnoli v. Massanari, 247 F.3d 34, 41 (3d Cir. 2011) (quoting Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 2011)).

It is well established that "the ALJ - not treating or examining physicians or State agency consultants - must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011) (citing 20 C.F.R. §§ 404.1527(e)(1), 404.1546(c)). Furthermore, while an ALJ must consider the opinions of treating physicians, "[t]he law is clear . . . that the opinion of a treating physician does not bind the ALJ on the issue of functional capacity" where it is not well supported or there is contradictory evidence. Chandler, 667 F.3d at 361 (alteration in original) (quoting Brown v. Astrue, 649 F.3d 193, 197 n.2 (3d Cir. 2011)); see also Coleman v. Comm'r. of Soc. Sec. Admin., 494 F. App'x 252, 254 (3d Cir. Sept. 5, 2012) ("Where, as here, the opinion of a treating physician conflicts with that of a non-treating, non-examining physician, the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason.") (quoting Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000)).

20

When a conflict in the evidence exists, the ALJ retains significant discretion in deciding whom to credit. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).  The ALJ is entitled to weigh all evidence in making its finding, and is not required to accept the opinion of any medical expert. Brown v. Astrue, 649 F.3d 193, 196 (3d Cir. 2011).  In discounting evidence, the ALJ must give a clear explanation for why it is doing so. Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999); Cotter v. Harris, 642 F.2d 700, 704-05 (3d Cir. 1981).

First, Plaintiff criticizes the ALJ's giving "significant weight" to the opinion of non-examining state agency physician Dr. McLarnon because it was "simply . . . based on a review of the record." (Pl. Br. at 16.)  But the ALJ is entitled to rely on Dr. McLaron's opinion in his discretion, especially when the state agency physician provides ample reasoning for her decision. See Grimaldi v. Colvin, No. 12-6522, 2016 WL 1182704, at *4 (D.N.J. Mar. 28, 2016)(citations omitted)(stating that "the opinions of non-examining physicians may override a treating source's opinions provided that the former are supported by evidence in the record").  Dr. McLarnon reviewed Plaintiff's medical history from January 2002 to July 2013, and concluded that while Plaintiff's conditions resulted in "some limitations" in her ability to perform work-related activities, they were "not severe enough" to keep her from working, as she

retained "the ability to perform work of a light and sedentary nature." (R. at 88-90.)  Plaintiff admits that Dr. McLarnon provided "detailed opinion evidence," and her mere disagreement with the weight the ALJ placed on the opinion is not enough for remand.

Next, Plaintiff argues that in dismissing treating physician Dr. Laws-Mobilio's opinions "with a summary statement," the ALJ improperly substituted his own lay opinion with that of the treating physician. (Pl. Br. at 18.)  The Court finds this argument unpersuasive.  Here, the ALJ found that Dr. Laws-Mobilio's February 2015 opinion was contradicted by medical and other evidence in the record, so he gave her opinion "little weight." (R. at 28.)  Specifically, the ALJ did not accord controlling weight to Dr. Laws-Mobilio's opinion because it was inconsistent with, and unsupported by, other substantial evidence in the case record, particularly Ms. Moody's conservative treatment, list of daily activities, and examining and non-examining doctors' analyses.  Plaintiff argues that the RFC evidence was only "evaluated in its entirety in one paragraph," but the ALJ describes the conflicting evidence in detail throughout the entirety of his reasoning on residual functional capacity. (Pl. Br. at 15.)  The ALJ notes that Ms. Moody testified to "an active range of ADLs, which include preparing light meals, cleaning, laundry, shopping, and driving

22

(including dropping her grandchildren off at daycare)." (R. at 26.)  Furthermore, the ALJ explained that "treatment notes show some improvement [with her RA and fibromyalgia] with such" medications Neurotonin, Lyrica, and OTC Ibuprofen. (Id.)  In addition, Dr. Montemayor's assessment that Mr. Moody could "sit, stand, and walk normally in an 8-hour work day," as well as "finger and grasp" directly conflicts with Dr. Laws-Mobilio's assessment. (R. at 410).  The Court agrees that the record also supports the ALJ's finding – for instance, Dr. Mishra noted that Plaintiff's fibromyalgia symptoms "improved with neurotonin 600 mg at bedtime" (Id. at 368), and Dr. Traisak recommended that Plaintiff "exercise regularly to help with Fibromyalgia" (Id. at 495.)  Although the ALJ could have explained his analysis more clearly, the Court nevertheless agrees that the objective record evidence contradicts Dr. Laws-Mobilio's opinion.

Finally, Plaintiff argues that the ALJ's decision lacked an adequate discussion of activities of daily living and Plaintiff's credibility. (Pl. Br. at 18-20.)  She cites to SSR 96-7p for the proposition that "[i]t is not sufficient for the adjudicator to make a single, conclusory statement that 'the individual's allegations have been considered' or that 'the allegations are (or are not) credible.'" (Id. at 19.)  Defendant responds that the ALJ did consider Plaintiff's credibility, and "reasonably determined that her subjective complaints were not

23

fully credible in light of her conservative treatment,
observations of evaluating specialists, and her activity level."
(Def. Br. at 11.)   The Court agrees.   The ALJ called particular
attention to inconsistent statements made by Plaintiff regarding
ability to work and reflecting on her credibility, which
Plaintiff conspicuously omits from her briefing. (R. at 26).   In
evaluating her credibility, the ALJ explained: "I also note that
although the claimant has a good work history, her last job
ended because of lack of funding for her position, and not
because of her medical condition.  Since then, she has been
applying for similar work." (Id. at 26.) Plaintiff's testimony
supports this, as she stated at her hearing:

> ALJ: Have you applied for work at all since October 2012?
> CLMT: Yes.
> ALJ: What kinds of jobs have you been applying for?
> CLMT: The same type that I, like clerical or bookkeeping,
> that type of thing.
> ALJ: What have you done as far as looking for the work? Do
> you get it off of like Craigslist, off of a newspaper,
> internet? How do you find out about the job?
> CLMT: Most times you have to go on the internet, even if—
> ALJ: Have you gotten any interviews?
> CLMT: No.
> ALJ: Why did your last job end?
> CLMT: I was laid off due to lack of funds, and then the
> center closed shortly afterwards.

(R. at 50.)   The court therefore cannot conclude that the
ALJ's finding on residual functional capacity is unsupported by
substantial evidence.

## C. THE ALJ ERRED IN CLASSIFYING PLAINTIFF'S PAST RELEVANT WORK UNDER STEP FOUR

Plaintiff next argues that the ALJ relied on flawed Vocational Expert testimony to mischaracterize her past relevant work as a "School Administrator." (Pl. Br. at 24.)  Defendant argues in response that that ALJ did all that was necessary under the Social Security regulations, and that Plaintiff's disagreement with the finding, which was based on the testimony of a vocational expert, is insufficient to conclude that the ALJ's finding was not supported by substantial evidence. (Def. Br. at 15.)  For the following reasons, the ALJ's finding that Plaintiff performed past relevant work as a "school administrator" is not based on substantial evidence; therefore, remand is required for proper classification of Plaintiff's past relevant work.

In assessing claimant's application for benefits, the ALJ is required to (1) ask, on record, whether vocational expert's (VE) testimony is consistent with the Dictionary of Occupational Titles (DOT)[1], (2) elicit a reasonable explanation where the inconsistency does appear, and (3) explain in its decision how conflict was resolved. Zirnsak v. Colvin, 777 F.3d 607 (3d Cir.

---

[1] The Dictionary of Occupational Titles is a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy . . . ." Burns v. Barnhart, 312 F.3d 113, 119 (3d Cir. 2002).

2014); see also Burns v. Barnhart, 312 F.3d 113, 117 (3d Cir. 2002) (explaining that where there is a conflict, an explanation must be made on the record and the ALJ must explain in his decision how the conflict was resolved).  The Third Circuit has emphasized that the presence of inconsistencies does not mandate remand, so long as "substantial evidence exists in other portions of the record that can form an appropriate basis to support the result." Zirnsak, 777 F.3d at 617 (quoting Rutherford v. Barnhart, 299 F.3d 546, 557 (3d Cir. 2005)).

The ALJ clearly satisfied the first Zirnsak factor, as he asked the VE if her testimony was consistent with the DOT, and she replied that it was. (R. at 30, 67.)  Regarding the second Zirnsak factor, the ALJ did elicit an explanation about why the VE classified Plaintiff's occupation as School Administrator, SVP 8, but it does not appear to be based on substantial evidence.  The VE explained that "the [school administrator classification] is closest to what I believe the position was. There's not an exact fit in the DOT." (Id. at 60.)  The ALJ responded: "All right, But based on your expertise, based on your training, this is how you would classify it, correct? The VE responded: "Yes." (R. at 44-46.)

The Court finds that the ALJ did not elicit a reasonable explanation because even a cursory examination of the job that the VE chose reveals that none of the tasks were actually

26

performed by Plaintiff.  The job description for a School

Administrator is as follows:

> Develops program curriculum and directs teaching personnel
> of school system: Confers with teaching and administrative
> staff to plan and develop curriculum designed to meet needs
> of students. Visits classrooms to observe effectiveness of
> instructional methods and material. Evaluates teaching
> techniques and recommends changes for improving them.
> Provides teachers with supplies, equipment, and visual and
> other instructional aids. Conducts workshops and
> conferences for teachers to study new classroom procedures,
> new instructional materials, and other aids to teaching.
> Assists in recruitment and in-service training of teachers.

Emp't & Training Admin., U.S. Dep't of Labor, Dictionary of

Occupational Titles § 099.117-026 (4th ed. 1991), 1991 WL 646931

("supervisor, education").

On the other hand, the record indicates that Plaintiff

described her job as an Administrative Assistant/Supervisor in a

daycare, where her duties included "typing, filing, answering

telephones, registration, generating reports, attending

meetings, occasional (sic) assisting in classrooms . . .

arranging repairs, supply ordering, etc." (R. at 236.)  She

further wrote that her duties included "greet[ing] visitors . .

. reports, occasionally relieve classroom teachers, meetings and

workshops, process applications, etc. (R. at 250, 270.)  In the

classroom, Plaintiff "chang[ed] children, the infants, playing

with them or doing, helping them do circle time." (R. at 45.)

The ALJ never referenced Plaintiff's own descriptions of her

past relevant work,[2] but only cited to the VE testimony that the Plaintiff's past work experience should be classified as a School Administrator.  Plaintiff's duties as discussed on the record have nothing to do with the job that the VE classified Plaintiff as having.  When asked during the hearing if she prepared curriculums, Plaintiff responded "Oh, curriculum, I'm sorry, no, I didn't prepare curriculum. That's usually done in advance." (Id.)

Additionally, Plaintiff's representative asked the VE about this classification discrepancy on cross examination, yet the ALJ still failed to follow up. Plaintiff's representative asked the VE if it was possible that the school administrator was a "composite job" because it "was not an exact fit" in the DOT (R. at 67.) The VE responded:

> VE: For the school administrator did have some, I mean, it describes a broad range of activities which was inclusive of what the claimant did do. It also had aspects of curriculum that, although she was in the classroom, she said the curriculum was prescripted or prescribed already, but she wasn't particularly a curriculum developer. I didn't use director. There was a director of daycare and the claimant said she worked under the director, so I didn't use that one. And I didn't feel that administrative assistant, although it's close to the duties she did, you know, provided, but it's not specifically to a school, so that's why I used the supervisor, the school administrator,

---

[2] The Court notes that a "claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work." SSR 82-62, 1982 WL 31386, at *3.

as supervisor, education job title. I thought it was the
closest that fit.

\* \* \* \* \*

REP: Is the short answer no, it was not a composite job? Is
that her testimony?
ALJ: I believe it is. You're saying that it is not a
composite job, correct?
VE: Not to my knowledge, because the other pieces that
would be considered would be beyond the scope of what she
did on a regular basis. For example, she said she was in
the classroom and she dealt with children but not on a
routine basis to consider that an integral part of what she
did, and that would be exertionally probably higher than
light. It would be light to maybe medium. And I did not
classify it as like a daycare worker. You know, there's a
DOT for daycare worker, but that didn't seem appropriate to
what I understand the claimant did. And she was working
there from 1990 to I believe 2012. That's a long time in
the same setting.

(R. at 68-69.)  Regarding the third Zirnsak factor, the ALJ

failed to explain in his decision how the conflict between the

VE testimony and the DOT was resolved.  He simply adopted the

testimony of the VE that Plaintiff's past work experience was a

School Administrator, an SVP 8, a skilled job.[3]  Additionally,

the state agency classified Plaintiff's work as an

Administrative Clerk, DOT 219.362-010, semi-skilled SVP 4 (R. at

79).  This demonstrates a clear inconsistency between what the

---

[3] The ALJ states that Plaintiff was a "college graduate," but the
record indicates that Plaintiff only completed one year of
college (R. at 25, 207.) While this error is harmless standing
alone, when coupled with the classification of Plaintiff's work
as a highly skilled occupation, it demonstrates that the ALJ's
classification of her past relevant work was not based on
substantial evidence.

VE testified, that Plaintiff had past relevant work at SVP 8,
and what the state agency found, an SVP 4 job.  The ALJ should
have asked the VE to explain this discrepancy, and included his
reasoning in his opinion. See Landeta v. Comm'r of Soc. Sec.,
191 F. App'x 105, 110 (3d Cir. 2006)("The ALJ's failure to
address evidence in direct conflict with his/her findings or to
reject uncontradicted evidence without a clear statement of the
reasoning is erroneous.").  Plaintiff offers other jobs in which
that Plaintiff could have been classified, such as a Nursery
School Attendant (DOT 359.677-018), a semi-skilled SVP 4
position (Pl. Br. at 27.)  The Court will not decide
specifically how Plaintiff should have been classified, as it
will remand to allow the ALJ to properly classify Plaintiff's
job. See Bernisky v. Comm'r of Soc. Sec., No. 15-1284, 2016 WL
6106716, at *4 (D.N.J. Oct. 17, 2016)(remanding the case for the
ALJ to develop the record as to Plaintiff's prior occupation and
noting that it "cannot discern, and the Defendant does not
identify, evidence in the record which supports the ALJ's
conclusion at step four").

     Thus, the ALJ could and should have addressed the apparent
defects and conflicts in the vocational expert's testimony,
especially after plaintiff's representative called his attention
to some of those defects, but instead uncritically adopted it.
On remand, the ALJ should ensure that he has correctly

                              30

classified Ms. Moody's past relevant work, obtaining the testimony of a vocational expert, if necessary.[4]

**V. CONCLUSION**

For all of these reasons, the Court finds that substantial evidence supports the ALJ's decision on residual functional capacity, but that the case should be remanded to accurately classify Plaintiff's past relevant work and determine whether claimant can perform the physical exertion requirements of her past relevant work, and then proceed to reevaluate the final step of whether the claimant is capable of performing other work existing in significant numbers in the national economy. An accompanying Order will be entered.

**December 23, 2016**           **s/ Jerome B. Simandle**

Date                      JEROME B. SIMANDLE
                                Chief U.S. District Judge

---

[4] The Court does not reach Plaintiff's Step Five objections regarding the transferability of skills. As Plaintiff correctly argues, if the ALJ was incorrect about Plaintiff's past work, then the remainder of the VE testimony regarding what skills were created by that past work and what skills would be transferrable lacks any support. (Pl. Br. at 28) Once the ALJ correctly classifies Plaintiff's past relevant work on remand, it will be necessary for the ALJ to reassess transferability of any skills obtained by Plaintiff from the job she actually performed. See Bruce v. Colvin, No. 12-827, 2013 WL 781990, at *4 (D.N.J. Feb. 28, 2013)("[D]ue to plaintiff's age, the vocational expert's classification of plaintiff's past relevant work is material to the ALJ's step five finding in this case.").